### SAYLES et al. v. OWENS et al.
### No. 2287.

Court of Civil Appeals of Texas. Eastland.

March 13, 1942.

Rehearing Denied April 17, 1942.

Sayles & Sayles, of Abilene, for appellants.

Smith & Eplen and R. W. Haynie, all of Abilene, for appellees.

GRISSOM, Justice.

In 1887 Thomas H. Gunn owned Blocks O and D, the West ½ of Blocks N, K, H and E and Block C and the West ½ of Block B in the Herman Ward Survey No. 90, City of Abilene. On May 18, 1887 Gunn conveyed to Abilene City Land and Improvement Company Blocks O and D and the West ½ of Blocks N, K, H and E out of said survey. The deed was recorded in the Deed Records of Taylor County. It recited:

"Know all men that whereas, I am the owner in fee simple of the blocks of land hereinafter described which the * * * Improvement Company is desirous of purchasing for the purpose as stated in its charter of beautifying the same by planting trees thereon and selling the same in such size lots as the directors might determine to actual settlers only who would build thereon within the time fixed by its Board of Directors residences of not less value than twenty-five hundred dollars.

"Now, therefore, in consideration of the premises and the sum of Three Thousand One Hundred Fifty Dollars cash to me in hand paid by the said * * * Improvement Company * * *

"Conveys: All of Block O and D and the West ½ of Blocks N, K, H and E out of the Herman Ward Survey No. 90 of the City of Abilene, Taylor County, Texas, as shown by the plat hereunto attached and made a part hereof; the property covered by the streets marked on said plat is embraced in this conveyance to said * * * Improvement Company, except such streets as have heretofore been dedicated to the Public as shown by plat recorded in records of Taylor County, Texas, to which reference is made. It is also understood that the whole Blocks J and I heretofore sold by me are also to be acquired by said * * * Improvement Company and that they are to be improved and sold as above provided. As a part of the consideration of this transaction; I agree to sell no part of Block C and no part of the west ½ of Block B in said Herman Ward Survey No. 90, City of Abilene, except to actual settlers who will agree to erect thereon within the time fixed by the Directors of the * * * Improvement Company, residences of not less than $2500 a piece and with the stipulation that no subdivision of any part of said property shall be sold no matter in whose hands the same may be except upon the above conditions."

Blocks J and I theretofore sold by Gunn were soon after the execution of said deed acquired by the Improvement Company. The Improvement Company obtained a charter from the State in May 1887. Its purpose, as stated therein, was:

"Second: The Company is formed for the purpose of purchasing, subdividing and selling land in the city of Abilene, Taylor County, Texas.

"Third: Also for the purpose of purchasing Blocks D, I, J, and O and the West ½ of Blocks N, K, H, and E in the Herman Ward Survey No. 90, City of Abilene, Taylor County, Texas, and for the purpose of beautifying blocks by planting trees thereon, and for the purpose of selling the same and the subdivisions thereof to such actual settlers only who will in such time as the directors may fix erect residences thereon of not less value than $2500 a piece, said property to be divided into such lots as the directors may from time to time agree upon. All other property purchased by the Company except the above designated blocks shall be controlled by the Board of Directors and sold on such terms and conditions as the Board of Directors may from time to time establish."

Said charter was recorded in the Deed Records of Taylor County.

In 1890 the heirs of Gunn conveyed to Henry Sayles the whole of Block C and West ½ of Block B of said Herman Ward Survey. Said deed contained no restrictions or covenant referable to the purposes for which said land might be used. On October 15, 1906, the charter of the Improvement Company was amended as follows: "The provisions of subdivision three of the original charter stipulating a specified cost of residences on the property therein mentioned, are hereby expressly abrogated except that the Board of Directors may hereafter make such stipulations as it sees fit, as to the cost of residences to be built on Boulevard Street." On October 30, 1906 the Improvement Company con-

544

veyed to M. Marx, Ed S. Hughes and Henry Sayles certain property. Said deed, insofar as it may be material here, is as follows:

It conveyed "All those certain Blocks O, J, I, and D and the West half of Blocks E, H, K, and N of the Henry Ward Survey No. 90, in the City of Abilene, Taylor County, Texas, and all spaces between the same containing forty-eight and one-half acres of land, the hereinafter described parts and parcels of land subject, however to the hereinafter mentioned conditions, limitations and trusts.

"All of the spaces left for roadways or streets between said blocks and part of blocks including Boulevard and North Hillside Circle and South Hillside Circle Streets, as well as the two acres belonging to Henry Sayles, and the two and one-half acres intended for the park, are conveyed in trust to the said Marx, Hughes and Sayles with the understanding that they shall hereafter make the proper conveyances thereof.

"In compliance with the resolution of the board of directors of said Abilene City Land and Improvement Company, dated the 30th day of October, 1906, it is hereby expressly stipulated that no part of said land fronting on Boulevard Street shall be sold by the grantees herein unless the purchaser from the grantees herein shall agree to erect thereon a residence to cost not less than twenty-five hundred dollars.

"And in further compliance with the amended charter of said Abilene City Land and Improvement Company, the stipulation of the specified cost of residences on all of said property, except that fronting on Boulevard Street is hereby expressly waived.

"Said Marx, Hughes and Sayles shall have the right at any time to subdivide said land hereby conveyed (except that held in trust as aforesaid) into lots, parcels of land, streets and alleys, and change such subdivisions as they see fit."

(The lots in controversy front on Boulevard Street or "Sayles Boulevard" and are out of the "restricted" portion of Boulevard Park Addition and are not out of said blocks nor out of the Highlands Addition.)

In May, 1910, by deed, which was recorded in Taylor County, Ed S. Hughes, Henry Sayles and Julia Marx (surviving wife and community survivor of M. Marx), together with John Sayles and wife and A. M. Robertson, partitioned among themselves all of Blocks O, J, I, and D and the West ½ of Blocks E, H, K, and N of said Herman Ward Survey. That deed recited that on October 30, 1906, M. Marx, Ed S. Hughes and Henry Sayles acquired from the Improvement Company by deed duly recorded in Taylor County Blocks O, J, I, and D and the West ½ of E, H, K, and N of said Ward Survey and all spaces in between the same. It recited that it was then desirable to recognize the individual interests of Henry Sayles, John Sayles, Ed S. Hughes and Julia Marx to certain portions of said property; to make provisions for streets and alleys and parks for the benefit of present and future owners of the property; to subdivide said land; to file a map of the subdivision for record; that there was attached to said partition deed a map entitled "Map of The Highlands" bearing signatures for identification of Henry Sayles, John Sayles, Ed S. Hughes and A. M. Robertson. Said map being duly recorded in the Deed Records of Taylor County. Said deed did not embrace Lots 1 and 2 in Block 5, Boulevard Park Addition to Abilene, and did not refer to the deed from Gunn to the Improvement Company. In December, 1915, Henry Sayles conveyed by a deed thereafter duly recorded in Taylor County an undivided one-half interest in Block B and the West ½ of Block C of said Ward Survey to Thomas Sayles. Henry Sayles died in June, 1916 and by the due probate of his will all of his interest in the said property was invested in his surviving wife, Hattie McAlpine Sayles. Thomas Sayles conveyed his undivided interest in Blocks B and C to Hattie McAlpine Sayles in February 1920. Said deed contained no mention of any restrictions or covenants referable to the use of Blocks B and C. In February 1920 Hattie McAlpine Sayles conveyed said Blocks B and C to Henry James et al. Said deed contained no restrictions or covenants referable to the use to which said blocks might be put. It did contain the following stipulation: "Provided, however, that the Boulevard and South Third Streets running through said property and Digby Avenue shall remain open for the use and benefit of the public." Neither the Improvement Company, Henry Sayles, Thomas Sayles, nor Hattie Sayles ever built any residence upon any part of the Blocks B and C. Henry James et al.

purchased said Blocks B and C as real estate investors and subdivided same into lots for the purpose of selling them to various parties and none of them built a residence on any part of said blocks, and none of them ever lived thereon. In March, 1920, Henry James et al. subdivided certain land, including Blocks B and C, as shown by a map of such subdivision recorded in the Deed Records of Taylor County, dedicating said subdivision as Boulevard Park Addition to Abilene. On March 17, 1920, by partition deed duly recorded in Taylor County, James et al. divided all of said property in Boulevard Park Addition among themselves. Lots 1 and 2 in Block 5 of the Boulevard Park Addition, said lots being located in the West ½ of Block B of said Herman Ward Survey, were conveyed by deed to W. G. Swenson, who in turn conveyed said lots to others. Said deed contained no mention of any restrictions or covenant referable to the use of said property. Swenson sold Lot 1, Block 5, Boulevard Park Addition to J. B. Fagan in 1920 and Lot 2, Block 5, Boulevard Park Addition to Mrs. Green in 1923. Fagan and Mrs. Green built residences on their respective lots and no other houses were ever built thereon. Each of said two houses cost as much as $2,500. In September, 1928, many persons who owned property in the Highlands Addition to Abilene, executed an instrument, thereafter duly recorded, in which it was recited that they "hereby assert that the original covenant in the chain of title to the Highlands, in substance that the use of the whole of the Highlands is restricted to residential uses and purposes is still in force and effect, and that each of the undersigned respectively has not consented or agreed, and does not consent or agree to the erection or maintenance of any business building of any kind or character on any lot in the Highlands * * * and the original owners and developers of the Highlands further state that said restriction was not waived in any sale by them of any lot, but has always been and is now in full force and effect." Said instrument was signed, among others, by Ed S. Hughes, John Sayles, Hattie M. Sayles and W. C. Owens, husband of the plaintiff. No part of Boulevard Park Addition is included in the Highlands Addition. The Highlands Addition is bounded on the north at Sayles Boulevard by South 5th Street. The Highlands Addition is out of the blocks conveyed in 1887 by Gunn to the Improvement Company and had Blocks I and J added thereto. Boulevard Park Addition, in part, and Lots 1 and 2, Block 5, Boulevard Park Addition here in question, are out of Block C and the west ½ of Block B of the Ward Survey, not conveyed by Gunn to the Improvement Company in the indenture of May 18, 1887 between Gunn and the Improvement Company, but retained by Gunn. Said Lots 1 and 2, Block 5, Boulevard Park Addition, being a part of said blocks concerning which Gunn agreed he would sell no part except to actual settlers who would agree to erect thereon, within the time fixed by the directors of the Improvement Company, residences costing not less than $2,500 "and with the stipulation that *no subdivision* of any part of said property shall be sold *no matter in whose hands the same may be* except upon the above conditions." (Italics ours.)

In August, 1941, Maggie F. Owens, wife of W. C. Owens, owned Lot 1, Block 5, Boulevard Park Addition and Lot 2, Block 5, of said Addition was owned by Katherine Talley. No business building has ever been erected, nor has any business ever been maintained or operated in the Highlands Addition, nor in that portion of Boulevard Park Addition consisting of Block C and the West ½ of Block B, retained by Gunn in the deed and indenture between Gunn and the Improvement Company in 1887. On August 14, 1941, Maggie F. Owens, joined by her husband, W. C. Owens, entered into a written contract with Safeway Stores for the sale of said Lot 1, Block 5, Boulevard Park Addition, to Safeway Stores for the purpose of building a grocery store and operating a grocery business on said lot. The contract provided that there should be no restrictions against the use of said lot for such a business. Safeway submitted the abstract to a title insurance company who delivered it to its attorneys for examination. Said abstract did not contain or make reference to the deed or indenture from Gunn to the Improvement Company. On August 29, 1941, Hon. John Sayles, of the law firm of Sayles & Sayles, wrote a letter to the manager of Safeway Stores advising it that said lot was restricted to use for residential purposes and that his firm would take such steps as might be necessary to enforce such restriction should its violation be attempted. This information was con-

veyed to the title insurance company who refused to issue a certificate of title unless such certificate contained an exception from liability by reason of any restriction against the use of said lot. Thereupon, Safeway Stores declined to complete the purchase but granted an extension of time so that the question might be speedily determined. After conferences Mr. Sayles advised counsel for Mrs. Owens that he would not, or doubted his right to, institute a suit to restrain the proposed use of said property until the commencement of the erection of the grocery store building. Thereupon, Mrs. Owens instituted this suit for the purpose of enjoining Mr. Sayles and his law partner from asserting that said lot was subject to such restriction; that is, that it could be used for residential purposes only, and could not be used for the operation of a grocery store. The owners of lots in "The Highlands" (the blocks conveyed by Gunn to the Improvement Company) and owners of lots in "Boulevard Park Addition" (blocks retained by Gunn) were impleaded by the defendants, the Sayles, and it was defended as a "class suit."

The hearing of the application for a temporary injunction was had on the verified petition and answer, stipulation of the parties, testimony of John Sayles and by attaching and referring to the defendant's original answer and maps attached thereto and a map attached to the plaintiff's petition. Mr. Sayles testified, among other things, as follows:

"Do you know of your own knowledge if it was the purpose of the Abilene City Land and Improvement Company to induce people to build homes in the subdivision that they put on out there?

"A. Of course at the time of the original transaction I was a child. That would put me six years of age, but I have heard talk about it. I was around my father's office. I was a law partner with my father and associated with him very closely and I bought my home property from my father. I do know by direct knowledge in part and by that association that the purpose was to subdivide the property into lots and induce people to build homes; as a residential district."

The court found that no restrictions had ever been placed on said property which would prevent its use as a grocery store and granted the temporary injunction as prayed for restraining defendants from interfering with the use of said lots by erecting and maintaining a grocery store thereon.

The court's findings of fact were substantially as hereinbefore stated. The court's conclusions of law were in substance: (1) That the covenant in the deed from Gunn to the Improvement Company regarding the subsequent sale of property retained by Gunn was a personal covenant, never performed, and was not a covenant running with the land, and that Block C and the West ½ of Block B, retained by Gunn, was thereafter sold without any restriction as to its use. (2) That there being no restriction placed on the use of said property in any conveyance in the chain of title to the property involved said property is not restricted as to the construction of a business building thereon. (3) That there being no restrictions on the use of said property its owners were entitled to an injunction against the parties attempting to interfere with its use as a grocery store.

"A covenant by a grantor that he will not erect, or suffer to be erected, any structure upon a lot adjoining the property which he has conveyed, is a covenant that runs with the land." Devlin on Real Estate, 3rd Ed., Vol. 2, p. 1756. "Building restrictions created both for the benefit of purchasers from a common grantor, and of the land retained by him, and intended to be annexed to the land, have been held to fulfill all the requirements for covenants running with the land." 12 Tex.Jur. 54. "Among other covenants which have been held to run with the land are: Covenants that lots shall be limited to residential use * * *." 26 C.J.S., Deeds, § 167, p. 545. "The person affected by the agreement as to the use of the land may be a purchaser, a lessee, or his assignee, or a mere occupant of the land under license. Such an agreement may occur in connection with a conveyance of land, restricting the grantor, or the subsequent transferees of the grantor, as regards the use of land retained by him, or restricting the grantee as regards the use of the land conveyed." Tiffany Real Property, 3d Ed., Vol. 3, p. 473. "A purchaser is * * * ordinarily charged with notice of an encumbrance upon the property created by an instrument which is of record, although the primary purpose of such instrument is, not the creation of such encumbrance, but the

conveyance of neighboring property. For instance, if one owning two adjoining city lots conveys one of them, the instrument of conveyance expressly granting an easement as against the lot retained in favor of that conveyed, the record of such conveyance will * * * affect a subsequent purchaser of the former lot with notice of such easement and he will take subject thereto. * ·* * And when * * * the acceptance of a conveyance of land, or of a grant of an easement in particular land, involves the creation of an easement upon other land, belonging to the grantee, in favor of land belonging to the grantor, by reason of words of the contract or reservation inserted in the instrument, a subsequent purchaser of such other land from the grantee would * * * be charged with notice of the easement, by reason of the record of the conveyance or grant, although the primary purpose thereof was to·convey an interest in different land. And if, in conveying lot A, the grantor enters into a restrictive agreement as to the improvement of lot B, retained by him, a subsequent purchaser of lot B would ordinarily be charged with notice of the agreement, by reason of its record as a part of the conveyance of lot A. Were he not so charged, the restrictive agreement might be to a considerable extent nugatory." Tiffany Real Property, 3d Ed., Vol. 5, p. 23, et seq.

In Finley v. Glenn, 303 Pa. 131, 154 A. 299, cited in the footnote to the foregoing authority, it was held that recordation of a deed containing building restrictions and the agreement of the grantor to impose like restrictions in all conveyances of certain adjacent lots owned by him is constructive notice to grantees of such other lots although the conveyance by the common grantor to them contains no restrictions and they have no actual notice of the restrictions. See, also, 7 R.C.L. 116; 15 C.J. 1251; 12 Tex.Jur. 54; 26 C.J.S., Deeds, § 167, p. 544.

In Couch v. Southern Methodist University, Tex.Civ.App., 290 S.W. 256, reversed on other grounds, Tex.Com.App., 10 S.W.2d 973, it was held that restrictive covenants created both for the benefit of purchasers of land conveyed by the grantor and of land retained by the grantor, which covenants were intended to be annexed to the land, constituted covenants running with the land. In Gulf Ref. Co. v. Dishroon, 13 S.W.2d 230, this court, in

an opinion by Chief Justice Hickman, held that restrictions of the use of lands platted jointly by the railroad and its owners, to railroad purposes, was for the benefit for all adjoining landowners covered by the plat, and not merely for the benefit of the original grantors. See, also, Curlee v. Walker, 112 Tex. 40, 244 S.W. 497; Davis v. Skipper, 125 Tex. 364, 371, 83 S.W.2d 318; Beckham v. Ward County Irrigation Dist., Tex.Civ.App., 278 S.W. 316, writ refused; Hooper v. Lottman, Tex.Civ. App., 171 S.W. 270; Edwards v. West Woodridge Theater Co., 60 App.D.C. 362, 55 F.2d 524, 525; Bethea v. Lockhart, Tex. Civ.App., 127 S.W.2d 1029, writ refused; Lowrance v. Woods, 54 Tex.Civ.App. 233, 118 S.W. 551; Gordon v. Hoencke, Tex. Civ.App., 253 S.W. 629; Plaster v. Stutzman, Tex.Civ.App., 8 S.W.2d 750; Green v. Gerner, Tex.Civ.App., 283 S.W. 615.

The indenture of , 1887 between Gunn and the Improvement Company recited that Gunn owned Blocks O and D, the West ½ of Blocks N, K, H, and E and Block C and the West ½ of Block B of the Herman Ward Survey. It recited that Gunn had theretofore sold ·Blocks J and ·I out of said survey. It stipulated that the Improvement Company was to acquire, and it immediately thereafter did acquire, Block J and I. Block C and the West ½ of Block B were retained by the grantor Gunn. The blocks described in said indenture, to-wit, those conveyed to the Improvement Company, those already sold by Gunn, and which the Improvement Company agreed to acquire, and those retained by Gunn, taken together constituted a rectangle. Said instrument recited that the purpose of the Improvement Company was to buy the blocks therein conveyed, and also to buy blocks J and I theretofore sold by Gunn, and to beautify all of said property by planting trees thereon. It further recited that, as a part of the consideration of said transaction, Gunn agreed to sell no part of the rectangle retained by him, to-wit, Block C and the West ½ of Block B, except upon the very terms by which the Improvement Company therein bound itself to sell the blocks therein conveyed to it, and the blocks, out of said rectangle, which Gunn had theretofore sold and the Improvement Company therein agreed to acquire, beautify and so sell. The record further shows that immediately after said conveyance the Improvement Company did start the

548

beautification and protection of the property therein conveyed to it, and immediately thereafter, in accordance with said agreement, acquired Blocks J and I and in a like manner began their beautification and protection. By the terms of said indenture Gunn and the Improvement Company agreed upon a general plan for the improvement, final subdivision and sale of lots or subdivisions of said blocks for residential purposes out of said entire rectangular tract. The building restrictions therein provided for were evidently created for the benefit of Gunn and the Improvement Company and of both the land conveyed and that retained by Gunn and Blocks J and I which the Improvement Company agreed to purchase. The restrictions therein stipulated, we think, were intended to be annexed to the land and constituted a covenant running with the land. In other words, we construe the indenture to mean that Gunn and the Improvement Company, or their assignees of such blocks, would beautify them for the purpose of a restricted residential addition, and when said blocks were subdivided the lots would only be sold to actual settlers who would build thereon (either on the land retained by Gunn or that conveyed to the Improvement Company or on Blocks J and I, to be acquired by the Improvement Company) a residence costing not less than $2,500. The agreement by Gunn that he would sell "no part" of the blocks retained by him except to actual settlers who would, within the time fixed by the directors of the Improvement Company, build a residence on such part or subdivision costing not less than $2,500, and that "no subdivision of any part of said property shall be sold no matter in whose hands the same may be except upon the above conditions", considered with the recitals of the purpose of the Improvement Company in acquiring the property therein conveyed and Blocks J and I, and selling the blocks in "such size lots" as its directors might determine, to actual settlers only, and the Improvement Company's agreement to purchase Blocks J and I, the only blocks out of said rectangle then not owned by the parties to said agreement, and to improve and sell Blocks J and I in the same manner, shows not only a general plan for the creation and improvement of a restricted residential addition, but further discloses that the sales contemplated and referred to in the indenture were the sales of lots or other subdivisions of said blocks. We cannot escape the conclusion that this was a covenant running with the land binding upon the parties thereto and their grantees.

Appellees say that even if the language used constituted a covenant running with the land, it would not restrict the use of the property to residential purposes only, and further that if it was intended to restrict the use of the lots to residential purposes that the parties by their own acts and conduct long ago abrogated such restriction and it became a nullity. After careful consideration of the entire record, we cannot agree with either contention. We conclude to the contrary that the lots were restricted to use for residential purposes and that said restrictions have not been abrogated, in such manner as to be binding upon the class of persons represented by defendants.

The Improvement Company could not have released the lots in question from the restrictions imposed on them. While the matter of the restrictions remained ex parte Gunn and the Improvement Company might have done so. But after the rights of purchasers were fixed their rights relative thereto could not have been lost by the act of the Improvement Company. Furthermore, as we understand the record, the amendment of the Improvement Company's charter did not attempt to vary the original plan insofar as it limited the use of its property to residential purposes; no building other than a residence costing at least $2,500 was ever erected on the lots in question, and no business building has ever been erected or business maintained on the rectangular tract referred to in the Gunn-Improvement Company indenture of 1887. The evidence would not have justified a finding that the parties at interest abrogated the instructions. Tiffany on Real Property, 3d Ed., Vol. 3, pp. 511, 512; 26 C.J.S., Deeds, § 167, pp. 549, 550; Woods v. Zimmerman, Tex.Civ.App., 8 S.W.2d 352, 354.

The judgment is reversed and the temporary injunction dissolved.